IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 2, 2019

## IN RE KYLAND F.

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-06007     Brad Lewis Davidson, Judge**

_____

### No. E2019-01058-COA-R3-PT

_____

The parents of a severely abused child appeal the termination of their parental rights. When the child was less than five months old, his primary care physician became alarmed upon discovering that his head circumference had grown at an abnormal rate. Upon being admitted to the hospital for tests, the medical staff noted retinal hemorrhaging and the presence of blood in his cerebrospinal fluid, both of which indicated inflicted trauma. A pediatrician with a subspecialty in child abuse examined x-rays that revealed healing fractures in the anterior lateral aspect of multiple ribs, which also indicated child abuse. When investigators from the Tennessee Department of Children's Services ("DCS") interviewed the parents, the father admitted to observing the mother hitting the child in the head and covering his face with a blanket to muffle his cries. The mother told investigators she squeezed and shook the child, but it was the father who struck the child in the head. DCS placed the child in foster care, and both parents were charged with aggravated child abuse. While the parents remained incarcerated, DCS filed a petition to terminate their parental rights on two grounds, severe child abuse pursuant to Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(27) and failure to manifest an ability and willingness to assume custody or financial responsibility pursuant to Tenn. Code Ann. § 36-1-113(g)(14). Following a trial, the court found that both grounds had been proven and that termination of the parents' rights was in the child's best interest. We reverse the trial court's ruling that DCS proved the ground of failure to manifest an ability and willingness to assume custody or financial responsibility; however, we affirm the trial court in all other respects. Accordingly, we affirm the termination of both parents' parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part, Affirmed in Part**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

Brett A. Cole, Seymour, Tennessee, for the appellant, Michael F.[1]

Pepper Bowser, Rutledge, Tennessee, for the appellant, Marissa C.

Herbert H. Slatery, Attorney General and Reporter, and Matthew D. Cloutier, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

Kyland F. was born premature in January 2018 to Michael F. ("Father") and Marissa C. ("Mother"). As a consequence of his premature birth, Kyland suffered a number of medical complications, including a hole in his heart, lung disease, and intraventricular hemorrhaging, a condition where blood collects in the air spaces of the brain. He was hospitalized for two months following his birth.

Kyland was home with his parents for a short while until April 2018, when he was readmitted to the hospital for persistent vomiting. A head ultrasound and CT scan showed fluid collections underneath the dura (the lining of his brain) and doctors thought this condition was related to Kyland's prematurity. Because his symptoms resolved within 24 hours, he was discharged, and a follow-up visit was scheduled with the neurologist.

Prior to that follow-up visit, on May 3, Kyland visited his primary care physician who became alarmed upon discovering that his head circumference had grown at an abnormal rate. Thereafter, he was readmitted to the hospital where physicians noted retinal hemorrhaging and the presence of blood in his cerebrospinal fluid, both of which indicated inflicted trauma. Based on concerns of possible abuse of the child, Dr. Mary Palmer, a pediatrician with a subspecialty in child abuse, was called to consult on the case. Upon examining Kyland's x-rays, which revealed fractures in the anterior lateral aspect of his left fifth, sixth, seventh, eighth, and ninth ribs, and his medical records, which reported subdural bleeding, retinal hemorrhaging, and fractured ribs, Dr. Palmer determined that Kyland's injuries and medical condition were the result of non-accidental trauma and were indicative of child abuse.

When investigators from DCS interviewed Mother and Father, Father admitted to observing Mother hit Kyland in the head and then cover his face with a blanket to muffle his cries. Mother told investigators that she was suffering from postpartum depression and that she squeezed and shook Kyland; however, she said Father was the one who struck Kyland in the head.

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Mother and Father were arrested on May 9, 2018, for aggravated child abuse, and DCS placed Kyland in foster care. On December 6, 2018, while Mother and Father were still incarcerated on the aggravated child abuse charges, DCS filed a petition to terminate Mother's and Father's parental rights in the Juvenile Court for Cocke County. DCS alleged two grounds for termination—severe child abuse pursuant to Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(27) and failure to manifest an ability and willingness to assume custody or financial responsibility pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

Mother and Father were released from jail in late January 2019. On April 25, 2019, while Mother and Father's criminal charges were still pending, the court held a trial on DCS's petition to terminate Mother's and Father's parental rights. At the trial, Mother, Father, Dr. Palmer, DCS Case Worker Michele Eyler, and Kyland's foster mother testified. As to both Mother and Father, the court determined that DCS proved by clear and convincing evidence the grounds of severe child abuse and failure to manifest an ability and willingness to assume custody or financial responsibility. The court also determined that termination was in the child's best interests.

Mother and Father appealed.

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); Tenn. Code Ann. § 36-1-113(c). And trial courts must make specific findings of fact and conclusions of law. Tenn. Code Ann. § 36-1-113(k). "[S]pecific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). When a trial court fails to comply with this requirement, "appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law." *Id.*

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *Id.*

ANALYSIS

On appeal, Mother and Father challenge the trial court's determination that grounds existed for the termination of their parental rights and that termination was in the child's best interests. We will first examine the grounds for termination.

## I.    GROUNDS FOR TERMINATION

### A.    Severe Abuse

Mother contends the evidence was insufficient to show that she abused Kyland or that she knew he was being abused. Likewise, Father argues there is no evidence that he caused Kyland's injuries, nor is there evidence that he witnessed the specific incident or incidents that caused Kyland's injuries. Father claims that if medical professionals did not know without conducting extensive medical tests that Kyland suffered from non-accidental injuries, then Father could not have known.

Pursuant to Tenn. Code Ann. § 36-1-113(g)(4), one of the grounds for termination of parental rights is severe child abuse, which is defined as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(27). Serious bodily injury includes, *inter alia*, a bone fracture, subdural bleeding, and retinal hemorrhaging. Tenn. Code Ann. § 39-15-402(c).

Regarding the severe child abuse ground for termination, this court explained:

Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no

witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.

*In re S.J.*, 387 S.W.3d 576, 591–92 (Tenn. Ct. App. 2012) (citations omitted).

The court further explained that "knowing" conduct was not necessarily intentional conduct. *Id*. at 592. "Knowing" conduct occurs when a person "has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *Id*. (quoting *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010)). Thus, "[a] parent's failure to protect a child will . . . be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re Caleb J.B.W.*, 2010 WL 2787848, at *5.

Based on the testimony and evidence at the trial, the court ruled that Mother and Father committed severe child abuse against Kyland as defined by Tenn. Code Ann. § 37-1-102(b)(27)(A)(i), and Kyland suffered serious bodily injury in accordance with Tenn. Code Ann. § 39-15-402(c). Specifically the court found:

Testimony from Dr. Palmer included a list of the injuries suffered by the very young child, which included no fewer than five broken ribs, at least one brain bleed, and retinal hemorrhaging; per Dr. Palmer, these injuries were caused by non-accidental trauma. Testimony revealed that [Mother] and [Father] were the only two individuals responsible for the child's care at the time of the injuries.

[Mother] was questioned about her previous admittance [that she squeezed and shook the child] and stated that she must have lied then. The Court is not convinced that [Mother's] story is suddenly truthful. [Mother] could provide no information that corroborated her new story and provided no alternative excuse for how the injuries could have occurred.

Equally concerning was the testimony by [Father]. Despite having been in the courtroom during Dr. Palmer's testimony, [Father] testified that he did not even believe that the child was abused. He felt "sad" that the child was injured, and he wished that it would not have happened, but stuck by his convictions that the child was not a victim of abuse. When testifying regarding whether he had witnessed any violent acts from [Mother] toward the child, [Father] repeatedly plead[ed] his Fifth Amendment Rights.

This Court is convinced that someone caused the injuries to the child—Dr. Palmer's testimony that the injuries were the result of non-accidental trauma were not refuted by any other expert testimony. The Court also finds that only [Mother] and [Father] were responsible for [Kyland's] care at the time that the injuries were sustained. Based on testimony, it seems apparent which Respondent was responsible for the injuries and which is covering for the other. Nonetheless, case law dictates only that someone must have done it and the other must have known about it—in this matter, that has clearly been proven. *See In re: EZ* [No. E2018-00930-COA-R3-JV, 2019 WL 1380110, at \*18 (Tenn. Ct. App. Mar. 26, 2019).]

Examining the testimony and other evidence admitted at the trial, we have determined that the evidence preponderates in favor of each of the trial court's factual findings.

Dr. Palmer testified that she believed within a reasonable degree of medical certainty that Kyland's subdural bleeding, retinal hemorrhaging, and multiple rib fractures all indicated "inflicted trauma," meaning someone caused those injuries to Kyland. Dr. Palmer explained that rib fractures show signs of healing within 10 to 14 days from the date of injury. When Dr. Palmer looked at the x-rays from Kyland's admission to the hospital in May, she saw evidence of healing. Therefore, Dr. Palmer determined that the rib fractures likely occurred two weeks prior to Kyland's May admission, around the time of his admission to the hospital in April. Dr. Palmer said the retinal hemorrhaging and subdural bleeding were likely caused in a separate incident. Therefore, in Dr. Palmer's opinion, there were at least two incidents of abuse. Dr. Palmer testified that Mother's admission that she squeezed and shook Kyland was consistent with the kind of action that would cause the injuries. As for Father's observation that Mother hit Kyland in the head, Dr. Palmer testified that those actions likely did not cause his injuries.

Dr. Palmer testified that an average person, looking at Kyland with an untrained eye, would not have noticed the signs of subdural bleeding or rib fractures but would have noticed the retinal hemorrhaging, which was obvious at the time of Kyland's May admission to the hospital. The increased head circumference, on the other hand, could have happened slowly over time such that a person who was with Kyland consistently may not have noticed. But Dr. Palmer testified that the force necessary to break Kyland's ribs was such that the person exerting the force should have known that it would cause serious harm.

DCS caseworker, Michele Eyler, testified to the findings of DCS investigators during Kyland's May admission to the hospital, and the DCS investigators' report was entered into evidence. The report stated that "[Father] confessed to observing the mother hit the child in the head with her hand and cover the child's head with a blanket to hide

the crying." As for DCS's interview with Mother, the report stated that "[Mother] confessed to being upset with the child, suffering from postpartum depression, and squeezing the child, and shaking the child. Even saying to 'shut the f*** up.' The mother then stated that the father was the one to hit the child in the head." The report also stated that both parents told DCS investigators that "no one had been left alone with Kyland since he came home from the hospital except the maternal grandmother, who watched him some."

When Mother testified, she was questioned about her previous statements regarding the abuse of Kyland:

> Q. All right. Have you ever made any statements where you admitted to committing the child abuse against the child?
> A. Yeah.
> Q. All right. But were those statements retracted?
> A. What does that mean?
> Q. Recanted, did you take them back, say that they weren't true?
> A. Yeah.
> Q. Okay. So you lied and confessed to injuring the child; is that correct?
> A. Yes.
> Q. Okay. Why did you lie about injuring the child?
> A. I don't know, to be honest.
> Q. Were you trying to protect anyone else?
> A. No.
> Q. Do you know who caused the injuries to the child?
> A. No.
> Q. All right. Do you have any alternative explanations now for the injuries to the child? You were unable to provide them at the time of the injuries, but have you thought of anything since then?
>
> . . . .
>
> A. No.

As for Father's testimony regarding the abuse, he consistently denied committing the abuse himself, invoked his Fifth Amendment right when asked about witnessing abuse, and even denied Kyland was ever abused:

> Q. Okay. Have you ever shaken the child, Kyland?
> A. No, sir.
> Q. Have you ever witnessed anyone shake Kyland?
> A. No, sir.

. . .

Q. Have you ever made any statements that you did witness abuse to Kyland?
A. No, sir.
Q. So you've never admitted to anyone that you saw the mother shake the child?
A. I take my Fifth Amendment.
Q. Okay. Have you ever witnessed anyone place a blanket over the child to stifle crying?
A. I take my Fifth Amendment, sir.
Q. Make sure you speak up for the microphone, so they can get you on the recording, sir.
A. Okay.
Q. Have you ever seen anyone strike the child?
A. Fifth Amendment.
Q. All right. Have you ever, yourself, placed a blanket over the child or shaken the child to stifle crying?
A. No, sir.

. . .

Q. Who was around your child?
A. I was and she was –
Q. She being [Mother]?
A. [Mother] was and he was at the hospital.
Q. And you and [Mother] were the primary caretakers of Kyland?
A. Yes, ma'am.

. . .

Q. All I'm asking is, do you feel like your child was abused? I am not saying did you abuse your child.
A. No, ma'am. No.
Q. You don't feel like your child was abused?
A. No ma'am.
Q. You don't feel like – so are you disagreeing that Dr. Palmer's testimony that this was inflicted trauma; are you disagreeing with that?
A. Yes.
Q. So your child was not a victim of any type of abuse?
A. No ma'am.

Considering the foregoing, we have determined that each of the court's factual findings is supported by a preponderance of the evidence and, taken together, the facts amount to clear and convincing evidence of the elements necessary to prove the ground of severe child abuse for both parents. *See In re Carrington H.*, 483 S.W.3d at 524.

As for Mother, she confessed to DCS investigators that she squeezed and shook Kyland. Dr. Palmer testified that Mother's confession was consistent with Kyland's injuries—subdural bleeding, retinal hemorrhaging, and fractured ribs—each of which is specifically included in the statutory definition of "serious bodily injury." *See* Tenn. Code Ann. § 39-15-402(c). Mother recanted her confession at the trial, but the court did not find her testimony to be credible, and we see no reason to question the trial court's credibility findings on appeal. *See In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) ("We accord great weight to a trial court's decisions regarding the credibility of witnesses who have testified before it."). Like the trial court, we find it significant that Mother offered no explanation for confessing to something she did not do.

As for the "knowing" element of the ground, Dr. Palmer testified that the force necessary to fracture Kyland's ribs was such that the person exerting the force should have known that it would cause serious harm. *See* Tenn. Code Ann. 37-1-102(b)(27) (defining "severe child abuse" as the "knowing use of force on a child that is likely to cause serious bodily injury or death"). Therefore, we find that DCS has proven by clear and convincing evidence that Mother committed severe child abuse.

As for Father, we have determined that the evidence clearly and convincingly established that Father knowingly failed to protect Kyland from abuse. *See id.* (defining "severe child abuse" as "the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death"). Strongly supporting this conclusion, Father confessed to DCS investigators that he witnessed Mother hit Kyland in the head. At trial, when Father was asked about this incident, he invoked his Fifth Amendment right against self-incrimination, and the court drew a negative inference from Father's response. This was proper because, in parental termination cases, the court is permitted to draw a negative inference from a witness's invocation of his of her Fifth Amendment right. *In re Nickolas E.*, No. M2009-01888-COA-R3-PT, 2010 WL 454809, at *6 (Tenn. Ct. App. Feb. 9, 2010).

Father argues that he only confessed to having witnessed Mother hit Kyland in the head, which as Dr. Palmer testified, likely did not cause his injuries. Father argues that this shows that he did not witness the abuse. But Father's argument is unavailing when considering that "[a] parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." *In re Caleb J.B.W.*, 2010 WL 2787848, at *5. Even if the evidence at trial only established that Father witnessed Mother hitting

Kyland in the head as Father asserts, Father could have and should have recognized that it was highly probable that severe child abuse would occur or that it had already occurred. *See id*. Therefore, DCS proved through clear and convincing evidence that Father knowingly failed to protect Kyland from severe abuse.

Accordingly, we affirm the determination of the trial court that DCS proved the ground of severe child abuse as to both parents by clear and convincing evidence.

### B. Failure to Manifest Ability and Willingness to Assume Custody

The court also determined that Mother and Father failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the child pursuant to Tenn. Code Ann. § 36-1-113(g)(14). Mother and Father argue that this ground was not proven because they both took meaningful steps to assume legal and physical custody of Kyland by obtaining employment and housing after being released from jail.

Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

*Id*. Accordingly, DCS must present clear and convincing evidence to establish that Father and Mother failed to manifest an ability and willingness to assume legal and physical custody, or that Mother and Father failed to manifest an ability and willingness to assume financial responsibility for Kyland. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). When evaluating ability, we focus "on the parent's lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). "When evaluating willingness, we look for more than mere words." *Id*. "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id*. When looking at the risk of substantial harm, we consider whether placing the child in the parent's custody would present a "real hazard or danger that is not minor, trivial, or insignificant." *Id*. at *6 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court determined that this ground had been proven as to both Mother and Father, finding in pertinent part:

[I]n the time since the child has come into the state's custody the Respondents manifested no ability or willingness to parent the child. During the 11 months, [Mother and Father] spent 8 months incarcerated for charges relating to the same facts that showed that Respondents had severely abused the child. However, sometime in January . . . both were released from the Cocke County Jail.

Since that time, [Mother] could not provide any proof that she had taken any steps to parent the children. [Mother] has not paid child support for the child or gotten employment to attempt to take care of the child or herself. Testimony showed that she had not asked about the child since her release. She had made no efforts to have visitation restored. [Mother] did state she was living with her mother. The Court finds that she has not attempted to provide for this child and testimony regarding her lack of remorse for the child's injuries satisfies the first prong that [Mother] has not shown an ability or willingness to assume legal and physical custody of the child or financial responsibility of the child.

.    .    .

[Father] testified slightly better than [Mother] in this regard. [Father] stated that he had begun a single class and had asked for some help getting things paid for by FSW Eyler. However, testimony showed that he had taken almost no initiative on his own, waiting until he was contacted about and then subsequently attended a Child and Family Team Meeting. [Father] had not paid any child support.

At the trial, Ms. Eyler testified that DCS created a permanency plan for Kyland on June 26, 2018, and the plan was ratified by the court in August 2018. The June Permanency Plan entered into evidence states that the sole goal for Kyland is adoption, and neither parent is to have contact with Kyland. The plan states that Mother is to, *inter alia*, pay child support, complete a psychological evaluation, and participate in parenting and anger management classes. The plan stipulates that Father is to do essentially the same, and in addition, complete an alcohol and drug assessment.[2] Ms. Eyler testified:

[A]t the initial Permanency Plan, Kyland was still in the hospital at that time, they didn't ask about him one time. They showed zero remorse, zero emotion about Kyland. Towards the end they asked about [their other

---

[2] Father tested positive for marijuana use in May 2018.

children] and tear up. But they never mentioned Kyland or showed any kind of emotion.

Ms. Eyler testified that Mother and Father remained incarcerated from May 2018 until the end of January 2019, and thus, could not complete the tasks assigned to them in the June 2018 Permanency Plan. However, according to Ms. Eyler, when Father and Mother were released from jail, neither contacted her regarding custody of Kyland, and neither paid any child support. Ms. Eyler said she had no contact with Mother or Father until March 25, 2019, when they attended a Child and Family Team Meeting to update Kyland's permanency plan. According to Ms. Eyler, Father requested DCS's assistance with services, and DCS arranged for payment of the alcohol and drug assessment for Father. Ms. Eyler testified that Father attended an alcohol and drug assessment the day before trial. Mother, on the other hand, was required to arrange for services through her insurance company, and as far as Ms. Eyler knew, Mother had not attended any classes as required by the permanency plan. Ms. Eyler testified that she was aware that both parents had housing but she had not been to either Mother or Father's home because the home visit is usually conducted after the parents complete parenting classes.

When Mother testified, she conceded that she had not paid any child support since being released from jail on January 23, 2019, though she had been employed since her release.[3] She said she was living with her mother, which is where she, Father, and Kyland lived prior to Kyland's May hospital admission. According to Mother, she lost her insurance coverage while incarcerated but she reapplied for insurance in early February 2019, and by early March, she had obtained insurance. Mother testified that after obtaining insurance, she scheduled parenting and anger management classes, and she was set to attend her first parenting class the day of the trial and anger management classes following the trial. She said she had not been in contact with Kyland due to the court's no contact order. She also explained that she did not ask about Kyland when she was released from jail or at any other time because she thought the no contact order "meant that I couldn't ask or know anything about [Kyland]."

Father also testified that he had not paid child support since his release from jail in late January 2019, though he did have a job. Father said he lived with his aunt in a five-bedroom house in Newport with other family members, and there was a bedroom available for Kyland. Father said he did not have insurance; therefore, when he attended the Child and Family Team Meeting in March, he asked Ms. Eyler for assistance in setting up an alcohol and drug assessment. Father testified that he was planning to sign up for parenting classes the day following the trial. Father also testified that he had not been in contact with Kyland due to the court's no contact order.

---

[3] The trial court found that Mother was not employed, but Mother testified that she was employed but had not provided proof of employment to DCS.

Considering the foregoing, we have determined that the evidence is not sufficient to prove the ground of failure to manifest a willingness and ability to assume custody or financial responsibility for either parent. *See In re Carrington H.*, 483 S.W.3d at 524.

We first note that the most relevant timeframe for this ground is the time preceding the filing of the petition to terminate parental rights, *see In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017), though this court may also consider the parent's actions following the filing of the petition and up to the time of trial. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. April 4, 2018). Both Mother and Father had been incarcerated for seven months when the petition was filed on December 6, 2018. Therefore, neither Mother nor Father had the ability to assume or show a "willingness" to assume legal or physical custody or financial responsibility for Kyland during the months immediately preceding the filing of the petition. *See In re Jonathan M.*, 2018 WL 5310750, at *5 ("Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child."); *see also In re Travis R.*, No. E2019-01024-COA-R3-PT, 2019 WL 5960648, at *4 (Tenn. Ct. App. Nov. 13, 2019) (examining the father's conduct after his release from prison to determine whether he failed to manifest a willingness to assume custody or financial responsibility).

Mother and Father were released from jail two months after the petition to terminate was filed,[4] and remained out of jail during the three months preceding the trial. According to Mother's and Father's testimony at the trial, they immediately obtained employment and housing upon release from jail. Additionally, Mother took the steps necessary to obtain insurance so that she could get services, and then both Mother and Father attended the Child and Family Team Meeting in March to update Kyland's permanency plan. Both parents testified that they took the necessary steps to sign up for classes, though the classes would not take place until the day of the trial or after. Additionally, Father set up an appointment for an alcohol and drug assessment, which he completed the day prior to trial. While the timing of the assessment might be perceived as too little too late, Ms. Eyler testified that the delay in setting up Father's assessment from the time Father requested the assessment in March 2019 was the fault of DCS.

Considering the obstacles presented by their seven-month incarceration and the tasks Mother and Father accomplished in the short three-month period following their release, we conclude that the evidence does not clearly and convincingly establish that

---

[4] The petition to terminate was filed on December 6, 2018. The parents were released from jail on January 23, 2019, and the petition was tried on April 25, 2019.

Mother or Father "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child" pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

However, because one ground for termination of their parental rights has been proven, that of severe child abuse, we now turn to the issue of whether terminating Mother and Father's parental rights was in Kyland's best interest.

## II.  BEST INTERESTS

Both Mother and Father contend that the applicable best interest factors found in Tenn. Code Ann. § 36-1-113(i) weigh against the termination of their parental rights. They argue that they have begun taking the necessary steps to provide a safe home for their child.

"In addition to presenting clear and convincing evidence establishing at least one statutory ground warranting the termination of a biological parent's parental rights," a petitioner must "present clear and convincing evidence that terminating the parent's rights is in the best interests of the affected child." *In re Bernard T.*, 319 S.W.3d 586, 606 (Tenn. 2010); Tenn. Code Ann. § 36-1-113(c). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010). Clear and convincing evidence "establishes that that truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence," and "[i]t produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

While the combined weight of the evidence must meet the clear and convincing standard, facts considered in the best-interests analysis need be proven only "by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). The best-interests analysis "is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i)." *In re Bernard T.*, 319 S.W.3d at 606.

When considering the statutory factors, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. "A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i)." *In re Audrey S.*, 182 S.W.3d at 878. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

Tennessee Code Annotated § 36-1-113(i) provides a list of nine non-exclusive factors for courts to consider when making the best interests determination. The analysis is not a rote examination of each factor followed by "a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.*

The most significant factor for the trial court in this case, and for this court, is factor six—"whether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6). We also find factor eight very relevant, "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8).

The evidence clearly and convincingly established that Mother physically abused Kyland to the point of fracturing his ribs and causing hemorrhaging in his brain. And according to Dr. Palmer's testimony, the injuries Kyland sustained are so severe that they will likely have long-term effects on Kyland's overall health and development. All the while, the evidence is clear and convincing that Father knew Kyland was being abused and failed to protect him. Therefore, the evidence established that neither parent is capable of providing a safe environment or safe and stable care for the child.

We also find that a change in caretakers would have a negative effect on Kyland's emotional, psychological and medical condition. *See* Tenn. Code Ann. § 36-1-113(i)(5) ("The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition"). According to the testimony of Dr. Palmer, Ms. Eyler, and the foster mother, Kyland has thrived in foster care. Dr. Palmer testified:

> It is reasonable to expect that Kyland will need ongoing neuro-development on follow up, and that he will have deficits that he did not – would not be expected to have before. But he has done remarkably well on those findings. And then I don't believe he's needed any further neurologic or neurosurgical interventions, which is wonderful.

Kyland's foster mother testified:

> Kyland has come a long way in a short time. When we got him at six-months-old, the doctors weren't sure what the future even held for him. And, you know, if he would have more seizures or more brain bleeds. And

if you were to speak to most of his doctors, they will all tell you he is a miracle.

Dr. Palmer testified that Kyland will need multiple medical visits to address his issues. A child who requires the level of medical care that Kyland requires will need vigilant and attentive caregivers, and the evidence shows that Mother and Father are not up to the task. We base our determination on Ms. Eyler's testimony that during the initial permanency plan meeting in June and when Mother and Father were released from jail, neither inquired about Kyland's progress or in any way showed concern for his physical well-being.

Moreover, while the foster parents have attended numerous medical appointments to ensure that Kyland is healthy and thriving, Mother and Father have not even bothered to provide financial support, though they are both gainfully employed. *See* Tenn. Code Ann. § 36-1-113(i)(9) ("Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.").

Both Ms. Eyler and Kyland's foster mother testified that Kyland has bonded with his foster parents, and they want to adopt him. Both also testified that Kyland considers his foster parents to be his parents, and he has no meaningful relationship with Mother or Father. *See* Tenn. Code Ann. § 36-1-113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent or guardian and the child."). Granted, the court issued a no contact order against Mother and Father which prevented them from developing a relationship with their child, but Mother and Father necessitated the no contact order by severely abusing Kyland, and thus, making it unsafe for Kyland to be in their custody.

Therefore, viewing the circumstances from Kyland's point of view, we conclude the evidence clearly and convincingly establishes that termination of Mother's and Father's rights is in Kyland's best interest.

### IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed equally against the appellants.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 16 -